**Affirmed as Modified and Opinion filed July 26, 2016.**



In The

# Fourteenth Court of Appeals

## NO. 14-14-00384-CV

## AJAZ R. SIDDIQUI, NAJEEB SIDDIQUI AND SUNCOAST ENVIRONMENTAL & CONSTRUCTION, INC., Appellants

### V.

## FANCY BITES, LLC, QUICK EATS LLC, FARHAN S. QURESHI AND SYED KHALID ALI, Appellees

**On Appeal from the 80th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2010-66787**

## O P I N I O N

This appeal involves a dispute among four individuals who were each co-equal managers and members of two limited liability companies that were in turn the general and limited partners of a Texas limited partnership that constructed, owned, and operated two Hartz Chicken restaurants in Houston. The partnership obtained two loans for construction costs in connection with the second restaurant,

and both loans were personally guaranteed by the four individuals, Ajaz R. Siddiqui, Najeeb Siddiqui, Farhan S. Qureshi, and Syed Khalid Ali. The Siddiquis' construction company performed the construction work on both restaurants. The restaurants proved to be unprofitable, however, and the partnership ultimately declared bankruptcy.

The Siddiquis and their construction company sued Qureshi and Ali for contribution based on the personal guarantees, claiming that the Siddiquis had paid more than their share of the liability owing on the partnership's loans. Qureshi and Ali answered and asserted numerous counterclaims against the Siddiquis and their construction company, including fraud and breach of fiduciary duty.

After a bench trial, the trial court found that Qureshi and Ali did not owe any money to the Siddiquis as co-guarantors and ordered that the Siddiquis take nothing on their claims. The trial court also found that the Siddiquis were liable to Qureshi and Ali for fraud and breach of fiduciary duty, and awarded Qureshi and Ali actual and exemplary damages on their counterclaims. On appeal, the Siddiquis raise seven issues, some of which contain multiple sub-issues, challenging the trial court's findings on liability and damages. The Siddiquis also contend that judgment should be rendered in their favor on their claims for contribution and attorney's fees. For the reasons explained below, we affirm as modified.

## FACTUAL BACKGROUND[1]

Brothers Ajaz and Najeeb Siddiqui jointly and equally own Suncoast Environmental & Construction, Inc.,[2] a construction company that was formed in

---

[1] Qureshi and Ali agree that the Siddiquis "have accurately stated the chronology of events" and acknowledge that their statement of facts "is largely taken from the [Siddiquis'] briefs." Accordingly, much of the factual background is taken from the parties' briefs.

[2] At some point, the Suncoast entity's name was changed to Suncoast Construction, Inc. The trial court's judgment identifies the Suncoast entity as "Suncoast Construction, Inc. f/k/a

1999. The Siddiquis and Suncoast have built a variety of projects, including gas stations, shopping centers, travel centers, outside fuel systems, multifamily townhomes, and garden apartments.

### A.    Blueline, Fancy Bites, and Quick Eats

In 2003, the Siddiquis purchased a 4.26-acre tract and developed it as the Champions Valley subdivision. The Siddiquis built thirty-six townhomes and a Texaco station at this location. They also built the shell of a retail building, located at 12011 Bammel North Houston (Bammel). The Bammel location would eventually become the first Hartz Chicken Restaurant owned and operated by Blueline Real Estate, L.P. (Blueline).

Blueline was formed in May 2006. The general and limited partners of Blueline were Fancy Bites, LLC and Quick Eats, LLC (collectively, the LLCs). The LLCs were owned by the Siddiquis. Abdul and Aneela Hameed, the owners of the Texaco station, expressed an interest in participating in Blueline to purchase the shell building at Bammel for a Church's Chicken restaurant. In October 2006, Aneela Hameed purchased a 50% interest in the LLCs for $406,250.00. However, Church's Chicken would not approve the location, so the Siddiquis returned the purchase money to the Hameeds.

### B.    The Bammel Hartz Chicken Restaurant

When the Church's Chicken franchise fell through, Najeeb Siddiqui began looking for other franchise opportunities. Najeeb had previously met Syed Khalid Ali through a common friend and knew that Ali was a Hartz Chicken franchisee at a location about two miles away. Najeeb called Ali to get information about the franchise, and the two began discussing the possibility of building out the shell

---

Suncoast Environmental & Construction, Inc."

building at Bammel as a Hartz Chicken restaurant.

Najeeb also discussed the possibility with Farhan S. Qureshi. Najeeb knew Qureshi because some years earlier Najeeb had unsuccessfully bid on a fuel system job for one of Qureshi's stores. In 2007 or 2008, Qureshi approached Najeeb about bidding on building Qureshi's retail shopping center on Antoine, which Qureshi later accepted. In connection with the bid, Najeeb also showed Qureshi what the Bammel location looked like, and they began discussing the possibility of a Hartz franchise there. Before these discussions began, Ajaz Siddiqui had never met Qureshi or Ali, and Qureshi and Ali had not met each other.

On January 8, 2007, in separate sale and purchase agreements, the Siddiquis sold to Qureshi and Ali each a 25% membership interest in Quick Eats and Fancy Bites, for a combined 50% interest. Qureshi and Ali each paid $212,500 for their 25% interests. Of the four, only Ali had experience in operating a chicken franchise.

Ajaz Siddiqui prepared the agreements between the Siddiquis as sellers and Qureshi and Ali as purchasers of their 25% membership interests in Fancy Bites and Quick Eats. Each agreement included a representation that it "contains a complete and accurate legal description of each parcel of real property owned by, leased to, or leased by the Company."[3] The agreement between Qureshi and the Siddiquis included an attached Exhibit "A," a plat of the tract where the shell building at Bammel was located. The agreement between Ali and the Siddiquis included no similar exhibit, but according to Ali, the Siddiquis verbally represented

---

[3] It is unclear whether the term "Company" is intended to refer to both Fancy Bites and Quick Eats, one of them, or something else entirely. Although the introductory paragraphs of the agreements appear to reflect that Fancy Bites and Quick Eats together are defined as "Company," section 2.01 of each sale and purchase agreement provides that "Company is a Member of the Companies owning all the membership interest in in both of the Companies, described hereinabove."

4

to him that the Bammel tract was owned by Blueline, Fancy Bites, or Quick Eats. At the time of the transactions, the Bammel property was actually titled in the name of Sunnyland Development, Inc., a holding company solely owned by Ajaz Siddiqui.

After the transactions, the Siddiquis, Qureshi, and Ali were each 25% members and owners of the LLCs. All four individuals were managers of the LLCs with equal voting power and ownership. On October 24, 2007, certificates of amendment were filed with the Secretary of State to identify all four as managers of the LLCs.

Effective January 2008, the Siddiquis, Qureshi, and Ali executed a Restated Agreement of Limited Partnership between Fancy Bites and Quick Eats. The partnership agreement identified Fancy Bites as the general partner of Blueline with a 1% ownership interest and Quick Eats as the limited partner with a 99% ownership interest. The partnership agreement contained a provision allowing Blueline to contract with any of the partners or their affiliates for the purchase of goods and services for the benefit of the entity. The Siddiquis, Qureshi, and Ali separately executed a Restated Company Agreement for each of the LLCs. The company agreements similarly permitted the LLCs to transact business with any manager, member, or affiliate.

On February 20, 2007, Qureshi completed a Confidential Franchise Application on behalf of Blueline for the Hartz Chicken Restaurant on Bammel. The Siddiquis had no involvement in applying for the franchise. Ali signed and filed assumed name records in Harris County on behalf of Blueline and Fancy Bites for the Bammel restaurant. The restaurant opened in March 2008. Ali, who had hired the first manager for the restaurant, fired him in July 2008. Between March and November of 2008, the Bammel restaurant never had a net profit,

except for April 2008, when it had a net profit of $260.28.

### C. The Antoine Hartz Restaurant

Qureshi owned a tract of land on Antoine Drive and had a Conoco station across the street. After Qureshi and Ali purchased their 25% interests in the LLCs, Qureshi contracted with Suncoast to build a retail center. The Siddiquis constructed a pad site on this location. The Siddiquis, Qureshi, and Ali decided this would be a good location for Blueline to open a second Hartz restaurant. Blueline agreed to buy the pad site from Qureshi for $150,000.00. The pad site represented 10–15% of the property Qureshi had originally purchased for around $300,000.00.

In January 2008, Blueline submitted a loan application to Southwestern National Bank (the Bank) to obtain a construction loan for the Antoine Hartz Chicken Restaurant. The Siddiquis, Qureshi, and Ali all signed the loan application, which sought $839,000.00 for "land acquisition, new construction/expansion/repair." That same month, the Bank sent separate loan commitments approving a construction loan in the amount of $645,000.00 and a commercial loan in the amount of $194,000.00 for furniture, fixtures, and equipment (FF&E) for the Antoine restaurant. The two loan commitments were executed by Blueline and guaranteed by Fancy Bites and the four individuals.

In connection with the development of the Antoine restaurant, Blueline and the four individuals executed and delivered to the Bank two promissory notes, deeds of trust, and guaranty agreements pursuant to which the Siddiquis, Qureshi, and Ali individually guaranteed Blueline's debt. Contemporaneously, title to the Bammel property was formally conveyed to Blueline by warranty deed, at no cost, on May 12, 2008.

Ali signed and filed assumed name records with Harris County on behalf of

Fancy Bites for the Antoine Hartz Chicken Restaurant on April 16, 2008. On July 21, 2008, and July 23, 2008, Blueline filed assumed name certificates with the Texas Secretary of State for the Hartz restaurants at the Bammel and Antoine locations. Both documents are signed by the Siddiquis, Qureshi, and Ali as managers of Fancy Bites.

Construction on the Antoine restaurant commenced on May 27, 2008. As construction progressed, Suncoast submitted draw requests to the Bank, which sent an inspector to the site to file a report on the construction and to approve each draw. On July 28, 2009, the Siddiquis, Qureshi, and Ali, on behalf of Blueline, executed an Affidavit of Completion, stating that the Antoine restaurant was completed. The restaurant opened in November 2009. Qureshi and Ali later fired the manager of the store and operated it themselves for three months. They then shut the store down.

### D. Bankruptcy and Foreclosure

The two restaurants did not generate sufficient revenues to pay for insurance, loan payments, property taxes, or payments to certain vendors. The Siddiquis paid the property taxes in 2009, 2010, and 2011. For those years, Blueline had negative income of $152,169.00, $199,132.00, and $134,350.00, respectively. The Siddiquis paid $297,947.08 in expenses on behalf of Blueline because of its insufficient revenue. Of that amount, $191,170.47 was for loan payments and $4,579.12 was for insurance. Qureshi and Ali began paying one-half of the note payments in July 2010.[4]

---

[4] The trial court found that Suncoast made the note payments to the Bank associated with the loans on behalf of Blueline. On appeal, Qureshi and Ali do not dispute the Siddiqui's assertion that these payments were treated as being made by the Siddiquis individually. The trial court found, however, that because Suncoast was not a guarantor of the loans, Qureshi and Ali do not owe any money to the Siddiquis or Suncoast.

Hartz repeatedly sent notices of default to Blueline and the individuals, warning that Blueline had defaulted on required franchise payments and note obligations. The Siddiquis met with Qureshi and Ali in July 2008, December 2008, and February 2009 to discuss the negative cash flow. Qureshi and Ali each agreed to contribute 25% toward Blueline's debts. Qureshi and Ali made payments each time to cover the shortages.

In July and October 2010, the Bank sent notices informing Blueline that it was past due on loan payments and requesting income tax returns and financial statements for Blueline, Fancy Bites, and the individuals. On March 11, 2011, counsel for the Bank wrote to lawyers for the individuals informing them that the Bank intended to post the properties for foreclosure unless certain financial documentation was provided and a payment of $11,445.57 was made by March 21, 2011.

The loan payments to the Bank were made current, but financials and tax returns requested were not provided. The Bank agreed to a reinstatement agreement that the Siddiquis signed. However, Qureshi and Ali did not agree to the form of the reinstatement agreement, so the Bank accelerated the notes and posted the properties for foreclosure. Blueline filed for Chapter 11 bankruptcy on February 7, 2012. The properties were purchased by the Bank in foreclosure on July 3, 2012. Qureshi then repurchased the Antoine tract that he had previously owned from the Bank. According to the parties, the bankruptcy was converted to a Chapter 7 on July 19, 2012. At the time of trial, Blueline, Fancy Bites, and Quick Eats had no assets.

### E.     The Ensuing Litigation

The Siddiquis and Suncoast filed suit against Qureshi, Ali, Blueline, Fancy Bites, and Quick Eats in October 2010. The defendants answered and filed

8

counterclaims, including fraud, breach of fiduciary duty, unjust enrichment, conversion, and civil conspiracy. After Blueline filed for bankruptcy, it was dropped as a party.

The case was tried to the court over four days in October 2013. At trial, the Siddiquis sought to recover from Qureshi and Ali $48,937.42 each for their pro-rata shares of payments the Siddiquis had made to the Bank to cover Blueline's indebtedness. Qureshi and Ali responded with claims for fraud, breach of fiduciary duty, and unjust enrichment. Qureshi and Ali sought actual damages totaling $514,482.68, representing their initial investments of $212,500.00 and $44,731.44 each paid toward the loan payments, and unspecified punitive damages. After the trial, Fancy Bites and Quick Eats nonsuited their claims.

On February 18, 2014, the trial court signed a modified final judgment, ordering that the Siddiquis and Suncoast take nothing by their suit, and that Qureshi and Ali recover actual damages on their breach of fiduciary duty and fraud claims in the amount of $514,482.68, as well as court costs and pre- and post-judgment interest from the Siddiquis and Suncoast. The trial court also ordered that Qureshi and Ali recover exemplary damages in the amount of $50,000.00 each from Ajaz Siddiqui.

On April 3, 2014, the trial court filed findings of fact and conclusions of law. Although the Siddiquis requested additional findings and conclusions, the trial court refused to make them.

## ANALYSIS OF THE ISSUES

On appeal, the Siddiquis and Suncoast (collectively, "appellants") raise seven issues: (1) there is no evidence of a fiduciary relationship between either the Siddiquis or Suncoast and Qureshi and Ali; (2) the evidence is legally and factually

9

insufficient to support a finding that the appellants committed fraud "in connection with the sale of 25% interests in Fancy Bites and Quick Eats to Qureshi and Ali" or "with respect to guaranty agreements"; (3) there is no evidence to support the fraud damages awarded; (4) no basis exists for a judgment against the appellants on an unjust enrichment theory; (5) no basis exists for a judgment on a civil conspiracy theory; (6) no basis exists for any award of exemplary damages; and (7) a money judgment should be rendered in favor of the Siddiquis against Qureshi and Ali for contribution and attorney's fees. Within several of these issues, the appellants contend that Qureshi and Ali lack standing to assert claims belonging to Blueline, a non-party debtor in bankruptcy.

We will first address the appellants' standing arguments, and then address the substantive issues in turn.

## I.      Standing to Assert Construction-Related Claims

As a preliminary point, we address the Siddiquis' contention that Qureshi and Ali lack standing to sue the Siddiquis or Suncoast with respect to construction-related claims. Because standing is a component of subject matter jurisdiction, it cannot be waived and may be raised for the first time on appeal. *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 445–46 (Tex. 1993).

### A.      Applicable Law

Standing requires "a real controversy between the parties" that "will be actually determined by the judicial declaration sought." *Austin Nursing Ctr., Inc. v. Lovato*, 171 S.W.3d 845, 849 (Tex. 2005); *Tex. Ass'n of Bus.*, 852 S.W.2d at 446. A determination of standing focuses on whether a party has a "justiciable interest" in the outcome of the lawsuit, such as when it is personally aggrieved or has an enforceable right or interest. *Lovato*, 171 S.W.3d at 849. A claim-by-claim

10

analysis is necessary to ensure that a particular plaintiff has standing to bring each of his particular claims. *Heckman v. Williamson Cnty.*, 369 S.W.3d 137, 153 (Tex. 2012).

It is well-settled that an individual stakeholder in a legal entity does not have a right to recover personally for harms done to the legal entity. *BJVSD Bird Fam. P'ship, L.P. v. Star Elec., L.L.C.*, 413 S.W.3d 780, 785–86 (Tex. App.—Houston [1st Dist.] 2013, no pet.); *Nauslar v. Coors Brewing Co.*, 170 S.W.3d 242, 250 (Tex. App.—Dallas 2005, no pet.). It is the nature of the wrong, whether directed against the entity only or against the individual stakeholder, and not the existence of injury, that determines who may sue. *See Haut v. Green Café Mgmt., Inc.*, 376 S.W.3d 171, 177 (Tex. App.—Houston [14th Dist.] 2012, no pet.); *Faour v. Faour*, 789 S.W.2d 620, 622 (Tex. App.—Texarkana 1990, writ denied).

For example, a limited partner does not have standing to sue for injuries to the partnership that merely diminish the value of partnership interests or a share of partnership income; such claims may be asserted only by the partnership itself. *Hall v. Douglas*, 380 S.W.3d 860, 873–74 (Tex. App.—Dallas 2012, no pet.); *Nauslar*, 170 S.W.3d at 250. Similarly, a member of a limited liability company lacks standing to assert claims individually when the cause of action belongs to the company. *Barrera v. Cherer*, No. 04-13-00612-CV, 2014 WL 1713522, at *2 (Tex. App.—San Antonio Apr. 30, 2014, no pet.) (mem. op.); *see also Wingate v. Hajdik*, 795 S.W.2d 717, 719 (Tex. 1990), *superseded by statute on other grounds*, *Sneed v. Webre*, 465 S.W.3d 169 (Tex. 2015) ("A corporate stockholder cannot recover damages personally for a wrong done solely to the corporation, even though he may be injured by that wrong.").

## B.    Application of Law to Claims

In this case, the appellants contend that Qureshi and Ali lack standing to

assert claims for breach of fiduciary duty, unjust enrichment, and fraud to the extent that these claims are directed to construction-related claims that belong exclusively to Blueline. Because we are to make a claim-by claim analysis of standing, *see Heckman*, 369 S.W.3d at 153, we will first address the appellants' standing complaints as to each of these claims. We will then turn to the appellants' substantive issues as necessary to resolve the appeal.

### 1. Breach of fiduciary duty

In their first issue on fiduciary duty, the appellants contend in a sub-issue that Qureshi and Ali lack standing to assert construction-related claims belonging to Blueline. The appellants also contend that the trial court's findings and conclusions relating to construction-related claims must be vacated because the trial court had no subject-matter jurisdiction to consider the claims.

The trial court's findings and conclusions include several fact findings concerning the Siddiquis' failure to comply with their fiduciary duties. The trial court found that "the transactions in question were not fair and equitable to Qureshi and Ali, due to the self-dealings by the Siddiquis with regard to Suncoast." In a separate section titled "Unjust Enrichment," the trial court found that the Siddiquis and Suncoast were unjustly enriched "by receiving $425,000 for the build-out of the Bammel property, when it actually cost about $80,000" and "by receiving $689,000 for the construction of the Antoine property, when it actually cost about $300,000."

The Siddiquis challenge these fact findings, arguing that the allegations by Qureshi and Ali relating to self-dealing and unjust enrichment all pertain to Suncoast's construction and equipping of the restaurants for Blueline, as do the allegations by Qureshi and Ali that Suncoast was paid more by Blueline than the restaurants actually cost. The Siddiquis also point out that the Blueline limited

12

partnership agreement expressly permits affiliates of the parties to contract with Blueline to provide goods and services, and the evidence shows that Suncoast built the restaurants for Blueline. Therefore, the Siddiquis contend, all of the construction-related claims asserted by Qureshi and Ali belong to Blueline and thus may only be asserted by Blueline, which is not a party. Further, because Blueline is a debtor in bankruptcy, the Siddiquis argue that the construction-related claims belong exclusively to the bankruptcy estate of Blueline.

In response, Qureshi and Ali do not dispute the Siddiquis' general statements of the law concerning standing or make any effort to distinguish between injuries incurred by Blueline or the LLCs and those Qureshi and Ali incurred individually. Instead, Qureshi and Ali merely argue that because the trial court did not award any damages for unjust enrichment, whether the trial court's findings were correct has no effect on the propriety of the judgment.

We agree with the appellants that, to the extent that Qureshi and Ali seek to recover individually on claims for construction-related damages sustained by either Blueline or the LLCs, they would lack standing to assert such claims. *See Jerry L. Starkey, TBDL, L.P. v. Graves*, 448 S.W.3d 88, 98–99 (Tex. App.—Houston [14th Dist.] 2014, no pet.); *Barrera*, 2014 WL 1713522, at *2; *Hall*, 380 S.W.3d at 873–74; *Nauslar*, 170 S.W.3d at 250. The evidence shows that Blueline, a limited partnership, was the owner of the Bammel and Antoine restaurants; Blueline contracted with Suncoast to finish the build-out of the Bammel restaurant and construct the Antoine restaurant; and Blueline took out the Bank loans for construction and FF&E for the Antoine restaurant.[5] Therefore, all claims for

---

[5] Qureshi and Ali claimed not to have seen the written construction contract between Blueline and Suncoast for construction of the Antoine restaurant; however, the contract was used to obtain the Bank loans, and there is no evidence or allegation that Qureshi and Ali individually contracted with Suncoast for the construction. There was no written contract between Blueline

13

damages relating to Suncoast's build-out and construction of the restaurants, including overcharging for services, would belong to Blueline.

However, we disagree that the trial court lacked subject matter to consider the actions of either the Siddiquis or Suncoast in connection with the individual claims of Qureshi and Ali for breach of fiduciary duty or to make the complained-of findings. *See Graves*, 448 S.W.3d at 98–99 (distinguishing plaintiff's individual claims from those belonging to partnership and stating that "[t]he question of whether there is any evidence that Graves was injured is a question of sufficiency of the evidence, not a question of standing"). Moreover, the trial court's fact findings concerning unjust enrichment are directed to the actions of either the Siddiquis or Suncoast based on the evidence presented and do not expressly refer to Blueline or find that Blueline was entitled to any damages. *See Kiepfer v. Beller*, 944 F.2d 1213, 1221–22 (5th Cir. 1991) (holding that jury could have considered evidence of harm to physician's professional association in determining whether physician proved the elements of his claims and damages accruing to physician personally based on those claims, where physician was awarded only damages that accrued to him individually and not to his professional association).We therefore deny the appellants' request that the fact findings be vacated on the ground that the trial court lacked subject matter jurisdiction to make them.

### 2. *Unjust enrichment*

The appellants next contend that Qureshi and Ali lack standing to assert— and the trial court had no jurisdiction to consider—any claim that Suncoast overcharged Blueline for construction costs associated with the Bammel and

---

and Suncoast for the completion of the build-out at the Bammel location, but Ajaz Siddiqui testified that Suncoast was doing the construction work for Blueline, and there was no evidence to the contrary.

Antoine restaurants. As we explained in the preceding section, the trial court had jurisdiction to make fact findings concerning the actions of the Siddiquis and Suncoast. And while we agree with the appellants that claims for construction-related damages would belong to Blueline, the trial court's judgment does not hold the appellants liable on an unjust enrichment theory or award Qureshi and Ali damages for unjust enrichment. Because the trial court did not award damages to Qureshi and Ali individually for injuries sustained by Blueline, there is no error; therefore, the unjust enrichment findings need not be addressed. *Cf. Wingate*, 795 S.W.2d at 719–20 (explaining that trial court erred by awarding unsegregated damages to corporate shareholder on both shareholder's individual claims and claim belonging solely to corporation).

### 3. *Fraud*

Appellants also contend that Qureshi and Ali lack standing to assert claims that the appellants committed fraud in connection with construction-related representations made after Qureshi and Ali invested in the LLCs. In addition to rendering judgment that the Siddiquis and Suncoast were liable for breach of fiduciary duty, the trial court also rendered judgment that they were liable for fraud. In its findings of fact and conclusions of law, the trial court found that the Siddiquis made unspecified disclosures and failures to disclose that constituted fraud. The trial court further found that the Siddiquis' fraud proximately caused actual damages to Qureshi and Ali in the amount of $514,482.68.

Because the trial court's findings and conclusions do not specify the underlying fraudulent conduct, the Siddiquis initially discuss the sufficiency of the evidence to support a finding of fraud in connection with the purchase and sale of the 25% interests in the LLCs to Qureshi and Ali based on three allegations concerning: (1) misrepresenting the ownership of the Bammel property; (2) the

15

costs of construction on the Bammel restaurant or how the investment proceeds would be used[6];  and (3) the personal guarantees executed by Qureshi for the two bank loans obtained by Blueline.

In response, Qureshi and Ali identify six "misrepresentations or nondisclosures" they contend support the trial court's fraud findings: (1) "title" ownership of the Bammel property; (2) costs of finishing construction on the Bammel restaurant; (3) costs of construction of the Antoine restaurant; (4) the size of the Antoine building; (5) progress payments to the Bank and false statements on "bills paid" affidavits; and (6) Bank payments made to Najeeb on behalf of Blueline, then transferred to Suncoast or Ajaz to pay Suncoast invoices.

In reply, the appellants argue that all of the alleged misrepresentations identified by Qureshi and Ali are construction-related claims belonging to Blueline, except for those concerning (1) the ownership of the Bammel property, (2) the cost of finishing the Bammel construction, or (3) the execution of the personal guarantees of Blueline's debt to the Bank by Qureshi and Ali. For the reasons already discussed, we agree. Therefore, our discussion of Siddiquis' challenges to the trial court's fraud finding will be limited to the sufficiency of the evidence to support an implied finding that the appellants committed fraud in connection with one or more of these allegations.

---

[6] The Siddiquis omit the Antoine restaurant because it was planned and built after Qureshi and Ali purchased their interests in the LLCs and was financed through the construction and equipment loans that Blueline entered into well after Qureshi and Ali purchased their interests in January 2007. We agree that Qureshi and Ali could not have been fraudulently induced to purchase their interests in Fancy Bites and Quick Eats in January 2007 based on alleged misrepresentations about the Antoine restaurant.

## II.    The Substance of the Appellants' Issues

Having resolved the appellants' complaints concerning Qureshi's and Ali's standing to assert construction-related claims belonging to Blueline, we turn to the substance of the appellants' challenges to the legal and factual sufficiency of the evidence.

### A.    Standards of Review

A trial court's findings are reviewable for legal and factual sufficiency of the evidence by the same standards that are applied in reviewing evidence supporting a jury's answer. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994). We review legal questions that rest on a factual basis de novo, while affording deference to the trial court's findings of fact. *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 337 (Tex. 2011).

We review the trial court's conclusions of law de novo. *See BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002). Conclusions of law are upheld if the judgment can be sustained on any legal theory the evidence supports. *Waggoner v. Morrow*, 932 S.W.2d 627, 631 (Tex. App.—Houston [14th Dist.] 1996, no writ). Incorrect conclusions of law do not require reversal if the controlling findings of fact support the judgment under a correct legal theory. *See id.*

When reviewing the legal sufficiency of the evidence, we consider the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. *City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex. 2005). We must credit favorable evidence if a reasonable factfinder could and disregard contrary evidence unless a reasonable factfinder could not. *See id.* at 827. We must determine whether the evidence at trial would enable

reasonable and fair-minded people to find the facts at issue. *See id.* The evidence is legally insufficient when (1) there is a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of the vital fact. *Id.* at 810.

In a factual sufficiency review, we must consider and weigh all of the evidence in a neutral light. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). The evidence is factually insufficient only if we conclude that the verdict is so against the great weight and preponderance of the evidence as to be manifestly unjust, regardless of whether the record contains some evidence of probative force in support of the verdict. *Id.*

The trial court is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Barrientos v. Nava*, 94 S.W.3d 270, 288 (Tex. App.—Houston [14th Dist.] 2002, no pet.). We may not substitute our judgment for that of the factfinder merely because we reach a different conclusion. *Herbert v. Herbert*, 754 S.W.2d 141, 144 (Tex. 1988).

### B.    No Evidence of an Informal Fiduciary Duty

In their first issue, which contains multiple sub-issues, the appellants challenge the trial court's findings that an informal fiduciary duty existed between the appellants and Qureshi and Ali; the appellants breached this duty; and Qureshi and Ali suffered damages as a result. In the dispositive argument, the appellants contend that there is no evidence of a relationship of trust and confidence giving rise to any fiduciary relationship between them and Qureshi and Ali.

The trial court's findings of fact and conclusions of law include findings that

18

the Siddiquis owed a fiduciary duty to Qureshi and Ali because "a relationship of trust and confidence existed between the Siddiquis and Qureshi and Ali." The trial court also made several findings concerning the Siddiquis' failure to comply with their fiduciary duties, including the previously discussed findings that the appellants engaged in self-dealing and were unjustly enriched by overcharging for construction services. The trial court found that the Siddiquis' breach of fiduciary duty proximately caused actual damages to Qureshi and Ali in the amount of $514,482.68, representing the total of the amounts Qureshi and Ali paid for their membership interests and the amounts they paid toward Blueline's indebtedness pursuant to their personal guarantees. Although the trial court did not find that Suncoast had a fiduciary relationship with Qureshi or Ali, the trial court did find that "the Siddiquis and Suncoast were engaged in a conspiracy against Qureshi and Ali" and rendered a joint and several judgment against the appellants.

### 1.    *The applicable law and the parties' arguments*

A fiduciary duty arises as a matter of law in certain formal relationships such as an attorney-client or trustee relationship. *Meyer v. Cathey*, 167 S.W.3d 327, 330 (Tex. 2005); *Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 674 (Tex. 1998). In contrast, an informal fiduciary duty may arise from a moral, social, domestic, or purely personal relationship of trust and confidence. *Meyer*, 167 S.W.3d at 331; *Assoc. Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 287 (Tex. 1998). "The existence of the fiduciary relationship is to be determined from the actualities of the relationship between the persons involved." *Thigpen v. Locke*, 363 S.W.2d 247, 253 (Tex. 1962). The law recognizes the existence of confidential relationships in those cases "in which influence has been acquired and abused, in which confidence has been reposed and betrayed." *Associated Indem. Corp.,* 964 S.W.2d at 287 (internal citations and quotations omitted).

19

It has long been recognized that "'not every relationship involving a high degree of trust and confidence rises to the stature of a fiduciary relationship.'" *Meyer*, 167 S.W.3d at 330 (quoting *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 176–77 (Tex. 1997)). To impose an informal fiduciary duty in a business transaction, the special relationship of trust and confidence must exist before and apart from the agreement made the basis of the suit. *Ritchie v. Rupe*, 443 S.W.3d 856, 874 n.27 (Tex. 2014); *Meyer*, 167 S.W.3d at 331; *Associated Indem. Corp.,* 964 S.W.2d at 288. Mere subjective trust does not, as a matter of law, transform arm's-length dealing into a fiduciary relationship. *Meyer*, 167 S.W.3d at 331; *Schlumberger*, 959 S.W.2d at 177. The Supreme Court of Texas has long cautioned that "[i]n order to give full force to contracts, we do not create such a relationship lightly." *Schlumberger*, 959 S.W.2d at 177.

In this case, Qureshi and Ali did not contend that a formal fiduciary relationship exists between them and the appellants. Therefore, they must have presented some evidence to support the trial court's conclusion that an informal fiduciary relationship existed based on a relationship of trust and confidence. The existence of an informal fiduciary duty is ordinarily a question of fact, but it becomes a question of law when there is no evidence of such a relationship. *La Ventana Ranch Owners' Ass'n, Inc. v. Davis*, 363 S.W.3d 632, 644 (Tex. App.— Austin 2011, pet. denied).

The appellants contend that the admission by Qureshi and Ali that they had no pre-existing relationship of trust and confidence with the appellants at the time they invested in Fancy Bites and Quick Eats is fatal to their case, citing the Supreme Court of Texas's most recent reiterations of that requirement. *See Ritchie*, 443 S.W.3d at 874 n.27 ("informal fiduciary duties are not owed in business transactions unless the special relationship of trust and confidence existed prior to,

and apart from, the transaction(s) at issue in the case."); *Cardiac Perfusion Servs., Inc. v. Hughes*, 436 S.W.3d 790, 791 n.1 (Tex. 2014) (per curiam) (noting that an informal fiduciary duty arises separate and apart from business relationships).

Qureshi and Ali acknowledge that there was no pre-existing relationship with the Siddiquis, but assert that "the Siddiquis' conduct during the course of their business venture—exerting complete control of the management and operations of the venture, to the point of self-dealing with another company owned by the Siddiquis—gave rise to an informal fiduciary relationship." Qureshi and Ali contend that the evidence showed that "the Siddiquis retained sole and exclusive control of Blueline, so that they could hide critical information from Qureshi and Ali." As support for their contentions, Qureshi and Ali reproduce a portion of *Guevara v. Lackner*, in which the court cites several cases for the proposition that "Texas courts have . . . recognized that an informal fiduciary duty *may* exist between the shareholders in a closely held corporation, depending on the circumstances." *See* 447 S.W.3d 566, 580–81 (Tex. App.—Corpus Christi 2014, no pet.) (emphasis supplied) (collecting cases from the First, Third, Fourth, and Fifth courts of appeals ).[7]

Although some Texas appellate courts have held that, in certain circumstances, an informal fiduciary duty may arise between shareholders in a closely held corporation in the absence of a pre-transaction relationship, Qureshi

---

[7] We note that *Guevara* itself is factually distinguishable because in that case, the court found that there was evidence supporting the existence of an informal fiduciary duty because the company agreement between Dr. Guevara and the defendants, the Lackners, expressly provided that "the Lackners, as managers, had 'the sole and exclusive control of the management, business and affairs of the Company." *Id.* at 581. There was also evidence that the Lackners' position as managers gave them intimate knowledge of the company's daily affairs and plans, and that Dr. Guevara, who was not a manager, did not have such extensive knowledge and was not involved in the daily operations of the company. *Id.*

and Ali do not cite and we have not found any case in which this Court has adopted such an expansive view. After *Meyer*, this Court has consistently determined that informal fiduciary duties do not arise in business transactions (as contrasted with a moral, social, domestic, or merely personal relationship) unless the special relationship of trust and confidence existed before the transaction at issue. *See, e.g.*, *Envtl. Procedures, Inc. v. Guidry*, 282 S.W.3d 602, 628 (Tex. App.—Houston [14th Dist.] 2009, pet. denied) (Guzman, J.) (quoting *Associated Indem. Corp.*, 964 S.W.2d at 288 (affirming directed verdict on informal fiduciary relationship because "[w]hen a business transaction is involved, 'the special relationship of trust and confidence must exist prior to, and apart from, the agreement made the basis of the suit"); *see also Davis-Lynch, Inc. v. Asgard Techs., LLC*, 472 S.W.3d 50, 61 (Tex. App.—Houston [14th Dist.] 2015, no pet.); *Daniels v. Empty Eye, Inc.*, 368 S.W.3d 743, 749–50 (Tex. App.—Houston [14th Dist.] 2012, pet. denied); *Priddy v. Rawson*, 282 S.W.3d 588, 599 (Tex. App.—Houston [14th Dist.] 2009, pet. denied); *Anglo-Dutch Petroleum Int'l, Inc. v. Smith*, 243 S.W.3d 776, 781–82 (Tex. App.—Houston [14th Dist.] 2007, pet. denied).

The Texas Supreme Court recently disavowed both a common law claim for shareholder oppression and a formal fiduciary duty to individual shareholders. *See Ritchie*, 443 S.W.3d at 889–91. In light of this precedent, notwithstanding the Court's acknowledged "'gap' in the protection that the law affords to individual minority shareholders," we see nothing in Texas Supreme Court authority since *Meyer* to suggest that an expansion of the duty is supported. *See id*. at 889. Moreover, we need not do so here because the evidence in this case provides no special circumstances or special facts warranting such an expansion beyond our existing precedent.

## 2.     *The evidence does not support the imposition of an informal fiduciary duty on the appellants*

Turning to the evidence of the circumstances of the parties' relationship, we begin with their contractual arrangements. It is undisputed that Qureshi's and Ali's investments in Fancy Bites and Quick Eats were arm's-length transactions that gave each of them a 25% membership in the LLCs. The relationship between shareholders or members in a closely held corporation, without more, does not give rise to fiduciary duties. *Cardiac Perfusion Servs.*, 436 S.W.3d at 791 n.1; *Power Reps, Inc. v. Cates*, No. 01-13-00856-CV, 2015 WL 4747215, at *10 (Tex. App.—Houston [1st Dist.] Aug. 11, 2015, no pet.) (mem. op.). Significantly, the agreements governing the LLCs provided that the Siddiquis, Qureshi, and Ali were each co-equal managers and owners of the LLCs, with none having a contractual right to greater control than any of the others. Additionally, the parties' agreements expressly permitted the LLCs and Blueline to contract with any of the partners, managers, members, or their affiliates. Qureshi and Ali were aware that Suncoast was owned by the Siddiquis, and they agreed that Suncoast would perform the build-out and construction for both restaurants.

Qureshi and Ali assert that, despite their positions as co-equal managers, the Siddiquis exercised "sole and exclusive control" of the management and operations of the venture. At trial, however, Qureshi and Ali acknowledged at least some participation in the venture. Ali testified that because he already owned a Hartz Chicken franchise and had contacts with the franchisor, the four agreed that he would "take the lead" on getting the Bammel restaurant started. With Ali's help, Qureshi applied for and obtained the franchise at the Bammel location. Ali also assisted with obtaining a sign for the restaurant, he signed and filed assumed name records on behalf of Blueline and Fancy Bites, and he hired and fired the restaurant's first manager. Qureshi sold the pad site for the Antoine restaurant to

Blueline, and at some point, Qureshi, Ali, and Najeeb Siddiqui all went to an auction site together to buy equipment for one of the restaurants. Qureshi and Ali also signed the loan documents and guarantees for the Antoine restaurant.

Further, although Qureshi and Ali both testified that the Siddiquis "controlled" all aspects of the entities and their finances, their testimony demonstrates that any control exercised by the Siddiquis resulted because Qureshi and Ali chose not to participate in the entities' financial affairs.[8] For example, Ali admitted that he was called on to open the Bammel restaurant because he had prior franchise experience, but he felt excluded from operating it when, the day after the store opened, Najeeb told him he did not need to be there every day since there was a store manager. Ali explained that his "feelings were hurt" and consequently he decided that he no longer wanted to be involved in the daily operations. He acknowledged, however, that as a co-equal manager of the LLCs he had an equal right to access the books and records.

Qureshi, like Ali, agreed that he had the right to participate in the management of the companies. Yet, Qureshi never asked the Siddiquis for access to the books and records and never asked to have his name put on the bank account. Qureshi testified that he assumed the LLCs were making the loan

[8] Although Qureshi and Ali denied knowing that the restaurants were not doing well, they acknowledged meeting with the Siddiquis several times to discuss cash flow shortages and they agreed to contribute additional funds. They also acknowledged receiving some financial information from the Siddiquis, Hartz Restaurant, and the Bank between 2008 and 2010. For example, both Qureshi and Ali received an email from Ajaz Siddiqui dated March 30, 2008, attaching sales and payroll data for the Bammell restaurant. There were also emails from Ajaz to Ali in April 2008, forwarding spreadsheets about sales, food and supply costs, and bills from vendors. Ajaz also sent Ali sales data for April, May, and June 2008. In early 2009, Ali forwarded to Ajaz weekly sales reports Ali was apparently receiving from Hartz corporate offices. Ali also acknowledged that in 2009 he regularly received letters from the Bank concerning late loan payments. In June 2009 and again in June 2010, Qureshi and Ali, along with the Siddiquis, were notified by legal counsel for Hartz that they were in breach of the franchise agreement for, among other things, failing to pay franchise fees.

24

payments until July 2010 (when he and Ali began paying 25% each), but he never asked to see the documentation. And although Qureshi testified that the Siddiquis controlled access to the two restaurants, Qureshi admitted that he did not want access to the restaurants, and he never asked for a set of keys to the Antoine restaurant until after he and Ali fired its manager. Qureshi also admitted that he never asked the Siddiquis for any sales or expense reports because he was busy with his own businesses and did not want to get involved.

Qureshi and Ali also assert that Siddiquis exercised control over Blueline "so that they could hide crucial information" from them, including self-dealing between Suncoast and Blueline. Specifically, Qureshi and Ali point to testimony they contend shows that the Siddiquis "prepared the construction invoices on behalf of Suncoast, then approved them on behalf of Blueline, without ever letting Qureshi and Ali see them." In the testimony cited as support, Qureshi states that the Siddiquis never sent him copies of the progress payments to Suncoast or any of the communications they had with the Bank about the status and progress of the loans. But Qureshi and Ali did not testify that the Siddiquis repeatedly refused to provide the information when requested or otherwise prevented them from obtaining this information despite the exercise of their positions as co-equal managers. And, even if, as the trial court found, the Siddiquis engaged in self-dealing "with regard to Suncoast," evidence that Suncoast overcharged non-party Blueline for its construction services, without more, is not enough to overcome the contractual business arrangements among the entities and impose fiduciary duties on the Siddiquis. *See Schlumberger*, 959 S.W.2d at 177 ("In order to give full force to contracts, we do not create [informal fiduciary relationships] lightly.").

Neither Qureshi nor Ali testified that they had any relationship other than a business relationship with the Siddiquis, and they did not testify that they placed

any particular trust or reliance on the Siddiquis to manage the venture for them. *See Thigpen*, 363 S.W.2d at 253; *see also Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 674 (Tex. 1998) (stating that a confidential relationship may arise "when the parties have dealt with each other in such a manner for a long period of time that one party is justified in expecting the other to act in its best interest"). Even if the trial court found that Qureshi and Ali acquiesced to the Siddiquis' management because they subjectively trusted the Siddiquis, such evidence does not transform the parties' business arrangement into a fiduciary relationship. *See Meyer*, 167 S.W.3d at 331; *Schlumberger*, 959 S.W.2d at 177; *see also Willis v. Donnelly*, 199 S.W.3d 262, 277 (Tex. 2006) (declining to impose a fiduciary duty in context business transaction when "[t]here was no evidence that, after the agreement was signed, Donnelly developed a close personal relationship of trust and confidence that could give rise to a fiduciary relationship.").

Finally, the trial court did not find that Suncoast owed a fiduciary duty to Qureshi and Ali. We conclude that if the trial court imposed joint and several liability on Suncoast based on an implied finding that Suncoast knowingly participated in the Siddiquis' breach of fiduciary duty to Qureshi and Ali, it was error. *See Kline v. O'Quinn*, 874 S.W.2d 776, 786 (Tex. App.—Houston [14th Dist.] 1994, writ denied) (explaining that a party cannot be jointly liable for participating in another defendant's alleged breach of fiduciary duty unless the other defendant owed a fiduciary duty to plaintiff). We therefore sustain the Siddiqui's first issue and hold that the trial court erred in rendering judgment that Qureshi and Ali recover actual damages from Ajaz Siddiqui, Najeeb Siddiqui, and Suncoast, jointly and severally, based on breach of fiduciary duties.

## C. Fraud

In addition to rendering judgment that the Siddiquis and Suncoast were liable for breach of fiduciary duty, the trial court also rendered judgment that they were liable for fraud. In its findings of fact and conclusions of law, the trial court found that the Siddiquis—but not Suncoast—made unspecified disclosures and failures to disclose that constituted fraud. The trial court further found that the Siddiquis' fraud proximately caused actual damages to Qureshi and Ali in the amount of $514,482.68.

In their second issue, the appellants contend that there is no evidence or factually insufficient evidence that the Siddiquis or Suncoast committed fraud in connection with the sale of the 25% interests in the LLCs to Qureshi and Ali. As we explained in the section on standing above, the only actionable allegations Qureshi and Ali have standing to assert individually are that the Siddiquis fraudulently induced Qureshi and Ali to purchase their 25% interests in the LLCs based on (1) ownership of the Bammel property, (2) the costs of finishing construction on the Bammel restaurant, or (3) the execution of the personal guaranties of Blueline's debt to the Bank by Qureshi and Ali.

To recover on an action for fraud or fraudulent inducement, a party must prove that (1) a material representation was made, (2) the representation was false, (3) when the representation was made, the speaker knew the representation was false or made it recklessly without knowledge of the truth as a positive assertion, (4) the representation was made with the intention that it should be acted upon by the party, (5) the party acted in reliance upon it, and (6) the party thereby suffered injury. *Formosa Plastics Corp., USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex. 1998); *Solutioneers Consulting, Ltd. v. Gulf Greyhound Partners, Ltd.*, 237 S.W.3d 379, 385 (Tex. App.—Houston [14th Dist.] 2007, no

27

pet.). Fraudulent inducement is a particular species of fraud that arises only in the context of a contract and requires the existence of a contract as part of its proof. *Haase v. Glazner*, 62 S.W.3d 795, 798–99 (Tex. 2001).

The failure to disclose information is equivalent to a false representation only when particular circumstances impose a duty on a party to speak, and the party deliberately remains silent. *In re Int'l Profit Assocs., Inc.*, 274 S.W.3d 672, 678 (Tex. 2009) (orig. proceeding) (per curiam). A duty to disclose may arise (1) when the parties have a confidential or fiduciary relationship; (2) when one party voluntarily discloses information, which gives rise to the duty to disclose the whole truth; (3) when one party makes a representation, which gives rise to the duty to disclose new information that the party is aware makes the earlier representation misleading or untrue; or (4) when one party makes a partial disclosure and conveys a false impression, which gives rise to a duty to speak. *Solutioneers Consulting*, 237 S.W.3d at 385. Whether such a duty to speak exists is a question of law. *In re Int'l Profit Assocs., Inc.*, 274 S.W.3d at 678.

### 1. *Ownership of the Bammel property*

At trial, Qureshi and Ali testified that they were never told that the Bammel property was owned by Ajaz's company, Sunnyland Development, rather than Blueline or one of the LLCs, and had they known this, they would never have bought into the venture. On appeal, the appellants contend that that they made no false oral or written representation concerning the ownership of the Bammel property to fraudulently induce Qureshi and Ali to invest $425,000.00 in the venture. The appellants also contend that the evidence is legally and factually insufficient to support a finding that any misrepresentation concerning ownership of the property was intentionally or recklessly made, and there is no evidence that Qureshi and Ali suffered any damages, because ownership of the property was

later transferred to Blueline at no cost.

a.     Evidence of a false representation

Qureshi and Ali acknowledge that the Siddiquis represented that they "owned" the Bammel property, but argue that this was a partial representation which triggered a duty to disclose "who had legal title, and how it might be transferred into an entity in which Qureshi and Ali were participating." The appellants reply that no duty arose on the basis of a "partial disclosure" because the representation that the Siddiquis "owned" the Bammel tract, as a whole, was not so misleading or untrue as to constitute fraud.[9] *See Foust v. Old Am. Cnty. Mut. Fire Ins. Co.*, 977 S.W.2d 783, 787 (Tex. App.—Fort Worth 1998, no pet.) ("The term 'owner' has no definite legal meaning.").

According to the appellants, because "ownership" does not necessarily require legal title but may encompass equitable or beneficial title, the representation of ownership was not false. The appellants further posit that "[b]ecause the Bammel tract was titled in the name of Sunnyland Development, Inc., which was owned 100% by Ajaz Siddiqui and Ajaz Siddiqui was an owner and manager of Fancy Bites and Quick Eats, Fancy Bites and Quick Eats were equitable owners of the Bammel tract." As support for this proposition, the appellants cite generally to cases in which the courts have held that in certain circumstances, reference to ownership of real property is not limited to possession of legal title, but may encompass other forms of ownership. *See Galveston Cent.*

_____

[9] The Siddiquis also argue that they owed no duty of disclosure regarding the actual owner of the Bammel property because Qureshi and Ali acknowledge that there was no pre-existing relationship of trust and confidence before they purchased their interests in the limited liability companies, and thus any informal fiduciary duty would have arisen only after the purchase and sale transactions occurred. We agree that, because Qureshi and Ali concede that the parties had no pre-existing relationship of trust and confidence, as a matter of law the Siddiquis did not have a fiduciary duty to disclose specific information concerning ownership of the Bammel property to Qureshi and Ali at the time they made their investments.

29

*Appraisal Dist. v. TRQ Captain's Landing*, 423 S.W.3d 374, 376 (Tex. 2014); *AHF-Arbors at Huntsville I, LLC v. Walker Cty. Appraisal Dist.*, 410 S.W.3d 831, 836–37 (Tex. 2012); *Estapa v. Saldana*, 218 S.W.2d 222, 223–24 (Tex. Civ. App.—San Antonio 1948, writ ref'd n.r.e.).

To bolster their specific contention that no misrepresentation occurred because the LLCs were equitable owners of the Bammel property, as Ajaz Siddiqui had an ownership interest in both the LLCs and Sunnyland, the appellants attempt to analogize this case to *Texas Standard Oil & Gas, L.P. v. Frankel Offshore Energy, Inc. See* 394 S.W.3d 753 (Tex. App.—Houston [14th Dist.] 2012, no pet.). In *Texas Standard*, this Court held that the appellants' representation in a settlement agreement that they would assign to the appellees "all of their right, title and interest in and to High Island Block A–96 (being an undivided seventy-five percent interest)" was not a representation that they held title to 75% of the property; rather, because one of the appellants owned a 75% beneficial interest in the property pursuant to a nominee agreement, and appellants merely agreed to transfer the interest they owned to appellees, no misrepresentation was made. *Id.* at 770–72.

As the appellants acknowledge, however, Sunnyland Development, the title holder to the Bammel property, was a completely separate company owned solely by Ajaz Siddiqui, and was not a party to the agreements with Qureshi and Ali. The appellants do not explain how the mere fact that Ajaz was also an owner and manager of Fancy Bites and Quick Eats created in the LLCs an equitable or beneficial ownership interest in a separate company's property. Indeed, Ajaz Siddiqui acknowledged that a transfer of the Bammel property from Sunnyland Development to the partnership would require him to execute a deed, which he could not remember doing. Further, unlike *Texas Standard*, this case involves a

30

seller's present representation that either Blueline or one of the LLCs owned the Bammel property, a representation that induced Qureshi and Ali to invest in the venture, not a seller's representation that it was merely agreeing to transfer to another whatever interest it owned.

We conclude that the evidence supports the trial court's implied finding that Siddiquis represented that Blueline, Fancy Bites, or Quick Eats owned a valuable asset that was actually titled in the name of a separate company solely owned by Ajaz Siddiqui. This representation was a partial disclosure that conveyed a substantially false impression and gave rise to a duty on the part of the Siddiquis to make a full disclosure, which they did not do before Qureshi and Ali made their investments in the venture. *See White v. Zhou Pei*, 452 S.W.3d 527, 539 (Tex. App.—Houston [14th Dist.] 2015, no pet.) (concluding that defendant "provided incomplete information that created a substantially false impression and failed to provide the full truth concerning Taurus's status").[10] Moreover, the fact that the Bammel property was later transferred to Blueline at no cost did not affect the false impression made at the time of the partial disclosure.

b.      Evidence of scienter

The appellants next argue that the evidence is legally and factually insufficient to show that the representation of ownership was known to be false when made or was made without knowledge of its truth. "Intent is a fact question uniquely within the realm of the trier of fact because it so depends upon the credibility of the witnesses and the weight to be given to their testimony." *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434 (Tex. 1986).

---

[10] The Siddiquis cite several cases for the general proposition that a partial disclosure is not actionable if it does not convey a false impression, but none of the cases cited involve analogous circumstances or otherwise compel a different conclusion.

Intent may be inferred from a party's actions before and after the fraudulent conduct and may be proven by the circumstances surrounding the fraud. *Id.*

On appeal, the appellants argue that there is no or factually insufficient evidence that they knowingly or recklessly misrepresented the ownership of the Bammel property. *See Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 526–27 (Tex. 1998) (explaining that a statement is not fraudulent unless "the speaker knew it was false when made or the speaker made it recklessly without knowledge of the truth" and that a misrepresentation that is merely made negligently is insufficient to establish fraud). The appellants also argue that the trial court's disbelief or disregard of the appellants' evidence is not evidence that the opposite is true. *See, e.g.*, *Am. Indus. Life Ins. Co. v. Ruvalcaba*, 64 S.W.3d 126, 143 (Tex. App.—Houston [14th Dist.] 2001, pet. denied). As evidence that Ajaz lacked the requisite intent, the Siddiquis point to Ajaz's testimony that he genuinely believed that Blueline owned the Bammel property when Qureshi and Ali made their investments, because he thought the property had been conveyed when the partnership interest was first sold to the Hameeds. The Siddiquis also contend that no testimony was elicited from Najeeb about his knowledge of the falsity of the representation.

We conclude, however, that sufficient circumstantial evidence exists to support a finding that the Siddiquis knowingly or recklessly misrepresented the ownership of the Bammel property. For example, Ajaz confirmed that he and Najeeb led Qureshi and Ali to believe that Blueline owned the Bammel property when they were discussing the partnership venture in January 2007. Ajaz admitted, however, that because Sunnyland Development owned the property, it would have been necessary for him to sign a deed conveying the property from Sunnyland

32

Development to Blueline, but he could not recall ever doing so. Azaj also admitted that he made no attempt to confirm that the Bammel property actually had been transferred to Blueline. Ajaz testified that he assumed that the transfer had been made when Najeeb and Hameed had signed the documents at the lawyer's office in connection with the earlier sale of the LLC interests to the Hameeds, but he acknowledged that Najeeb was not authorized to convey property owned by Sunnyland Development.

There was also evidence that in July 2007, well after Qureshi and Ali purchased their interests, Najeeb filed in Harris County a "Commercial Development Permit Application" for the Bammel property in which he represented that "Najeeb R. Siddiqui/Sunnyland" was the property owner, not Blueline. Further, the Siddiquis did not transfer title to the Bammel property to Blueline until 2008, and then only after it became necessary to so in connection with securing the Bank loans for the construction of the Antoine restaurant—loans that substantially benefitted Suncoast and the Siddiquis. *See Spoljaric*, 708 S.W.2d at 435 ("Since intent to defraud is not susceptible to direct proof, it invariably must be proven by circumstantial evidence."); *Solutioneers Consulting*, 237 S.W.3d at 386 (holding that evidence was legally and factually sufficient to support jury finding of fraudulent intent based on circumstantial evidence and defendant's subsequent acts). We hold that legally and factually sufficient evidence demonstrates that the Siddiquis knowingly or recklessly misrepresented the ownership of the Bammel property with the intent that Qureshi and Ali rely on this misrepresentation.

c.    Evidence of damages

The Siddiquis also contend that there is no evidence of damages to Qureshi and Ali resulting from any alleged misrepresentation of ownership. The Siddiquis

33

point out that title to the Bammel property was conveyed to Blueline on May 12, 2008, as security for the Bank loan, and Qureshi and Ali were not harmed by the delay in transferring title because it was done free of cost. Further, the Siddiquis assert that Qureshi and Ali "could not articulate or explain how they were damaged in any way by the later transfer of the property."

We disagree that the cost-free transfer of the Bammel property after Qureshi and Ali made their investments is evidence that Qureshi and Ali were not harmed by the misrepresentation of ownership. The evidence shows that neither Blueline, Fancy Bites, nor Quick Eats owned any type of interest in the Bammel property at the time the Siddiquis represented that it was a valuable asset of the partnership to induce Qureshi and Ali to each pay $212,500.000 for their 25% interests in the LLCs. Qureshi and Ali both testified that they would not have made their investments if they had known that the property was not an asset of the venture. Thus, contrary to the Siddiquis' assertion, the record contains some evidence of damages to Qureshi and Ali as a result of the Siddiquis' misrepresentation of ownership.

### 2. *No representations concerning cost of Bammel restaurant build-out*

The Siddiquis next contend that there is no evidence of any oral or written fraudulent misrepresentations or nondisclosures of the costs of finishing construction on the Bammel property or the use of investment funds made before Qureshi and Ali invested in the venture. In support of their contention, the Siddiquis point to the purchase and sale agreements for the LLCs, which provide for no specific use or disposition of the purchase price of $212,500.00 for each 25% interest. The Siddiquis also point to Qureshi's and Ali's testimony that the Siddiquis and Suncoast made no representations regarding the use of their initial

34

investments or how much the Bammel construction would cost.

In response, Qureshi and Ali point to their testimony concerning what they "understood" about how the money would be used or what they "believed" the build-out should have cost, but they repeatedly acknowledged that the Siddiquis made no express representations to them. Confining our review to pre-partnership conduct, we agree that the evidence shows that the Siddiquis and Suncoast made no express representations or fraudulent nondisclosures to Qureshi or Ali concerning the cost of the Bammel restaurant build-out. Further, because Qureshi and Ali acknowledge that the Siddiquis had no pre-existing relationship of trust and confidence with them, the Siddiquis had no duty to provide that information.

### 3.     *No representations concerning the guarantees*

Lastly, the Siddiquis contend that there is no evidence that they made any misrepresentations or nondisclosures to induce Qureshi and Ali to sign the guaranty agreements with the Bank. Specifically, the Siddiquis argue that the loan documents expressly state the amount of the loans and specify that the loans were made for the purpose of providing funds for construction, land costs, and FF&E for the Antoine restaurant. We agree that the documents disclose the amounts and purpose of the loans. Qureshi and Ali, both experienced businessmen, acknowledged at trial that they were aware of the financing and guaranty documents they signed, and they do not direct us to any evidence of misrepresentations or nondisclosures by the Siddiquis concerning the guarantee agreements. Accordingly, we hold that there is no evidence that the Siddiquis fraudulently induced Qureshi and Ali to execute the guarantees. *See In re Int'l Profit Assocs.*, 274 S.W.3d at 679 (explaining that it is presumed that a party to a contract understood and agreed to its contents).

35

### 4.    *Summary of evidence of fraud*

In summary, we conclude that there is no evidence to support a finding that the Siddiquis or Suncoast made fraudulent misrepresentations or nondisclosures to Qureshi and Ali concerning the cost of the build-out of the Bammel restaurant or the guarantees. However, we also conclude that the Siddiquis' representation that Blueline, Fancy Bites, or Quick Eats owned the Bammel property to induce Qureshi and Ali to invest a total of $425,000.00 in the Hartz Chicken franchise venture was a misrepresentation or partial disclosure of ownership that triggered the duty to disclose that the property was actually titled in the name of a separate company wholly owned by Ajaz Siddiqui. The evidence is also legally and factually sufficient to show that the Siddiquis made the representation with the requisite intent and Qureshi and Ali sustained damages as a result. We therefore overrule the Siddiquis' second issue.

## D.    Fraud Damages

In their third issue, the appellants contend that there is no evidence of fraud damages as a matter law, because Qureshi and Ali did not present evidence from which the proper measure of restitution damages could be calculated to support the award of $425,000.00. The Siddiquis also argue that the award of $89,482.68, representing the return of guarantee payments made by Qureshi and Ali, are not recoverable because they are consequential damages that were not reasonably foreseeable or directly traceable to the alleged fraudulent misrepresentations.

### 1.    *Some evidence supports direct damages for Qureshi's and Ali's initial investments*

Texas recognizes two measures of direct damages for common-law fraud: the out-of-pocket measure and the benefit-of-the-bargain measure. *Formosa*, 960 S.W.2d at 49; *Fazio v. Cypress/GR Houston I, L.P.*, 403 S.W.3d 390, 394 (Tex.

App.—Houston [1st Dist.] 2013, pet. denied) (en banc). Out-of-pocket damages, which derive from a restitutionary theory, measure the difference between the amount the buyer paid and the value of the property the buyer received. *Baylor Univ. v. Sonnichsen*, 221 S.W.3d 632, 636 (Tex. 2007) (per curiam); *Leyendecker & Assocs., Inc. v. Wechter*, 683 S.W.2d 369, 373 (Tex. 1984).[11] In contrast, benefit-of-the-bargain damages, which derive from an expectancy theory, measure the difference between the value represented and the actual value received. *Sonnichsen*, 221 S.W.3d at 636; *Leyendecker*, 683 S.W.2d 373. Both measures are determined at the time of sale. *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 817 (Tex. 1997); *Fazio*, 403 S.W.3d at 395.

The Siddiquis contend that Qureshi and Ali presented evidence only of the "value paid" component of the out-of-pocket measure of damages and no evidence of the "value received" component. Absent such evidence, the Siddiquis argue that Qureshi and Ali are barred from recovering on their fraud claim as a matter of law. *See Leyendecker*, 683 S.W.2d at 373; *Graves*, 448 S.W.3d at 109 n.28 (citing *Arthur Andersen*, 945 S.W.2d at 817, for the proposition that "[i]n cases of fraud or negligent misrepresentation, out-of-pocket damages are the difference between the value paid and the value received, measured at the time of the transaction.").

Qureshi and Ali respond that the evidence is legally sufficient to support an award of restitution damages because they "were induced to invest $212,500

---

[11] Qureshi and Ali refer interchangeably to restitution and rescission when discussing the basis for the damages awarded. The Supreme Court of Texas has explained that rescission is merely a shorthand name for "the composite remedy of rescission and restitution." *Cruz v. Andrews Restoration, Inc.*, 364 S.W.3d 817, 825 (Tex. 2012) (citing RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 54 cmt. a (2011)). Like restitution, rescission is calculated based on the amount paid minus the benefits received. *See id.* (noting that "rescission is not a one-way street" and "requires a mutual restoration and accounting, in which each party restores property received from the other.").

apiece in a venture that turned out to be worthless." Therefore, Qureshi and Ali argue, they are "entitled to be place in the position they would have been had the fraud not occurred." To the extent that Qureshi and Ali contend that they were entitled to the return of the full amount of their investment because the venture ultimately failed, we reject this contention because the value received must be determined at the time of the transaction. *See Graves*, 448 S.W.3d at 109 n.28; *Fazio*, 403 S.W.3d at 395–96; *see also Highland Capital Mgmt., L.P. v. Ryder Scott Co.*, 402 S.W.3d 719, 729–30 (Tex. App.—Houston [1st Dist.] 2012, no pet.) (concluding that holders of unsecured bonds presented no evidence of the value received at the time of their investment in bonds to support fraud and misrepresentation damages, and that testimony that bonds were later considered "essentially worthless" was not competent evidence of value at the time bonds were purchased).

Nevertheless, the record contains some evidence that, at the time Qureshi and Ali made their investments, the venture had no value. As discussed in the previous subsection, the Siddiquis misrepresented that Fancy Bites, Quick Eats, or Blueline owned the Bammel property when they induced Qureshi and Ali to make their investments. Further, on cross-examination, Ajaz Siddiqui admitted that the venture had no other assets:

> Q.    [Defense counsel] So, is it fair to say that in January 2007 when you were discussing with Mr. Qureshi and Mr. Ali about investing in this partnership with you and your brother, that you told them and led them to believe that the partnership owned the Bammel property at that time, correct?
>
> A.    [Ajaz Siddiqui] That's what I believed.
>
> Q.    Right. Okay. But in reality the partnership didn't own anything at that time, correct?
>
> A.    That's correct.

Additionally, the Siddiquis' testimony concerning how they determined the value of the partnership—and thus what amount to charge Qureshi and Ali for their 25% interests—rested on the assumption that the partnership actually owned the Bammel property that was to be built out and operated as a Hartz Chicken franchise.

This evidence is legally sufficient to support a finding that the "value received" component of the out-of-pocket measure of damages was zero at the time the investments were made. *Cf. Woodyard v. Hunt*, 695 S.W.2d 730, 732–33 (Tex. App.—Houston [1st Dist.] 1985, no writ) (holding that there was legally insufficient evidence from which jury could award full value of plaintiff's investment in shares of corporation as fraud damages when plaintiff's shares "had some value in view of the undisputed evidence that the corporation owned an interest in certain real property"). Accordingly, legally sufficient evidence supports the trial court's award of $425,000.00 as out-of-pocket damages in favor of Qureshi and Ali on their fraud claim.

### 2. *No evidence supports an award of damages for Qureshi's and Ali's payments on behalf of Blueline*

The Siddiquis next challenge the award of $89,482.68, compensating Qureshi and Ali for loan payments they made pursuant to the guaranty agreements signed in connection with the Bank loans for construction of the Antoine restaurant. According to the Siddiquis, these damages are not recoverable because they are consequential damages that were not reasonably foreseeable or directly traceable to the alleged fraudulent misrepresentations.[12] In response, Qureshi and

---

[12] Direct damages compensate the plaintiff for loss that is conclusively presumed to have been foreseen by the defendant from his wrongful act. *Arthur Andersen & Co.*, 945 S.W.2d at 816. Consequential damages, unlike direct damages, result naturally, but not necessarily, from the defendant's wrongful act and must be foreseeable and directly traceable to the wrongful act. *Id.*

Ali argue only that they would not have made the $89,482.68 in payments absent the initial fraud. They do not address the Siddiquis' contention that these damages are consequential, rather than direct, damages. However, because we have determined that there is no evidence that the Siddiquis committed fraud in connection with the execution of the guaranty agreements, Qureshi and Ali are not entitled to compensation for their payments to the Bank on behalf of Blueline.

We therefore overrule the appellants' third issue in part and hold that the evidence supports the trial court's award of damages of $425,000.00 to Qureshi and Ali, representing the amount of their initial investment in the venture. We also sustain the issue in part and hold that no evidence supports the award of $89,482.68 for payments made by Qureshi and Ali on Blueline's behalf pursuant to the guaranty agreements they signed.

### E.    Unjust Enrichment

In their fourth issue, the appellants challenge the trial court's unjust enrichment findings. In addition to the appellants' argument that Qureshi and Ali lack standing to assert such claims, which we have addressed above in the section on standing, the appellants also argue that unjust enrichment is not an independent cause of action; the existence of contractual agreements between Blueline and Suncoast preclude an unjust enrichment claim as a matter of law; and the unjust enrichment findings are not supported by legally sufficient evidence. However, because the trial court did not render judgment that the Siddiquis or Suncoast were liable for unjust enrichment and did not award damages on that basis, we need not address these contentions. We therefore overrule the appellants' fourth issue.

### F.    Conspiracy

The trial court's findings of fact and conclusions of law included a finding

that "[t]he Siddiquis and Suncoast were engaged in a conspiracy against Qureshi and Ali." In their fifth issue, the appellants contend that there are no grounds on which to render judgment against either the Siddiquis or Suncoast for conspiracy, because conspiracy requires an underlying tort and there was no fraud or breach of fiduciary duty. *See Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996); *Zurita v. Lombana*, 322 S.W.3d 463, 482 (Tex. App.—Houston [14th Dist.] 2010, pet. denied). Although we disagree with the appellants' argument to the extent that we have already concluded that the evidence supported the trial court's fraud finding based on the Siddquis' misrepresentation that either Blueline or the LLCs owned the Bammel property, we conclude that it is unnecessary to address the bulk of this issue because the trial court did not render judgment against any of the appellants for conspiracy.

Elsewhere in their brief, however, the Siddiquis have argued that the trial court's rendition of judgment against Suncoast for joint and several liability was error to the extent that it was predicated on the conspiracy finding. Because we have already concluded that there is no evidence to support the underlying tort of breach of fiduciary duty, the only remaining basis for imposing joint and several liability on Suncoast would be an implied finding by the trial court that Suncoast conspired with the Siddiquis to commit fraud. But Qureshi and Ali do not direct us to any evidence that Suncoast was involved in the Siddiquis' misrepresentation of the ownership of the Bammel property, and we have located none in the record. Therefore, we sustain the appellants' fifth issue in part and hold that the trial court erred to the extent that it imposed joint and several liability on Suncoast for the actual damages awarded to Qureshi and Ali.

### G.     Exemplary Damages

In their sixth issue, the appellants contend that the exemplary damages

awarded against Ajaz Siddiqui should be reversed and rendered as a matter of law because there is no independent and underlying tort cause of action or tort damages. We have already concluded that the trial court did not err by determining that the Siddiquis were liable for damages based on fraud; therefore, we reject the appellants' initial argument that the exemplary damages award is improper as a matter of law.

The appellants also contend, however, that there is no or legally insufficient evidence to support the exemplary damages assessed because there is no clear and convincing evidence of fraud or malice. In support of this argument, the appellants point to the trial court's fact findings concerning exemplary damages that reference the costs of construction of the Bammel and Antoine restaurants. As to those findings, the appellants argue there is "no legally sufficient evidence" that Ajaz Siddiqui fraudulently induced Qureshi and Ali to make their initial investments or execute the personal guarantees "based on construction costs or the costs of improvements." Further, to the extent that the trial court's construction-related findings are based on purported overcharges by Suncoast, the appellants again argue that those claims belong solely to Blueline, and therefore Qureshi and Ali lack standing to assert them for the reasons previously asserted.

The trial court's findings were not limited to construction-related findings, however. Among other things, the trial court found that Ajaz "intentionally defrauded Qureshi and Ali regarding the acquisition of their membership interest in Fancy Bites and Quick Eats" and that "[t]here is clear and convincing evidence of fraud perpetrated by Ajaz R. Siddiqui against Qureshi and Ali regarding their acquisition of their membership interest in Fancy Bites and Quick Eats."[13] As

---

[13] Although the Siddiquis assert in a footnote that they challenge all of the trial court's seventeen exemplary damages findings, they present no argument or analysis addressing the findings not involving construction costs.

discussed above, we have rejected the Siddiquis' evidentiary challenges to the trial court's finding that the Siddiquis fraudulently induced Qureshi and Ali to invest a total of $425,000.00 for the purpose of constructing and operating a Hartz Chicken franchise on the Bammel property, when in fact the title to the Bammel property was held by a separate company wholly owned by Ajaz Siddiqui.

We recognize that our evidentiary review of the appellants' challenge to the trial court's fraud findings was not made under the elevated standard of proof required to support an exemplary damages award. *See* Tex. Civ. Prac. & Rem. Code § 41.003(a) (requiring proof "by clear and convincing evidence" to support exemplary damages award). The appellants assert generally that the exemplary damages assessed against Ajaz Siddiqui "are supported by no evidence or legally insufficient evidence" and there is "no clear and convincing evidence of fraud or malice" to support an award of exemplary damages. However, the appellants do not brief the clear and convincing standard of review or provide any analysis explaining how the evidence presented to the trial court does not meet this standard. We therefore hold that any challenge to the legal sufficiency of the evidence to support the exemplary damages award is waived. *See* Tex. R. App. P. 38.1(i); *McCullough v. Scarbrough, Medlin & Assocs., Inc.*, 435 S.W.3d 871, 911–12 (Tex. App.—Dallas 2014, pet. denied) (holding appellant waived on appeal challenge to exemplary damages award when he made only conclusory assertions in his brief and provided no analysis explaining how the evidence presented to the fact finder did not meet the clear and convincing standard of review). We overrule the appellants' sixth issue.

## H.    The Siddiquis' Request for Rendition of a Money Judgment

Finally, in their seventh issue, the Siddiquis request that judgment be rendered in their favor on their contribution claims against Qureshi and Ali, plus

43

attorney's fees. According to the Siddiquis, the undisputed evidence shows that they paid more than their share of the indebtedness owed to the Bank, totaling $195,749.89. Therefore, the Siddiquis contend, they are entitled to judgment against Qureshi and Ali for contribution for their one-fourth of the payments. See *Miller v. Miles*, 400 S.W.2d 4, 9 (Tex. Civ. App.—Tyler 1966, writ ref'd n.r.e.) (holding co-guarantor established a cause of action for equitable contribution). The Siddiquis also contend that they are entitled to attorney's fees of $50,347.50, based on their trial counsel's uncontroverted testimony. In response, Qureshi and Ali argue that the Siddiquis' fraud vitiates their purported right to transfer some of their losses to Qureshi and Ali.

The trial court made nine findings of fact in connection with the Siddiquis' claim for payment from Qureshi and Ali based on their obligations as co-guarantors. Of those, the Siddiquis discuss only the following finding: "Qureshi and Ali, as co-guarantors on the two bank loans, do not owe any money to the Siddiquis or Suncoast for note payments to Bank on behalf of Blueline since the Siddiquis and Suncoast have 'unclean hands' and the Siddiquis committed fraud and breach of fiduciary duty." The Siddiquis assert that because there is no evidence to support the findings that the Siddiquis and Suncoast committed fraud or breached fiduciary duties, "there are no findings that serve as a defense to the obligations of Qureshi and Ali to repay the Siddiquis." But we have already overruled the Siddiquis' evidentiary challenges to the trial court's implied finding that the Siddiquis fraudulently induced Qureshi and Ali to invest in the venture based on their representation of ownership of the Bammel property. Therefore, the Siddiquis' argument fails.

Next, the Siddiquis again argue that to the extent that Qureshi and Ali rely on their claim that the Siddiquis and Suncoast committed fraud and breach of

fiduciary duty with respect to the management of Blueline or construction overcharges, Qureshi and Ali have no standing as guarantors to assert the claimed conduct as a defense to their repayment obligations, citing *Thaw v. Schachar*, No. 07-10-0027-CV, 2011 WL 3112064, at *4–5 (Tex. App.—Amarillo July 26, 2011, pet. denied) (mem. op.) (holding that co-shareholder lacked standing to assert counterclaim for fraud, breach of fiduciary duty, and other claims belonging to corporation in response to shareholder's action for enforcement of co-shareholder's guaranty obligation on a note and lease after shareholder paid off balances and was assigned the note and lease). Although we agree with the holding in *Thaw* for the reasons previously discussed, it does not preclude the trial court's denial of the Siddiquis' claim for equitable contribution in this case because in *Thaw*, the co-shareholder seeking to avoid enforcement of the guaranty obligation asserted only claims belonging to the corporation. *See id.* at *4. In the present case, Qureshi and Ali made individual claims for fraud based on the Siddiquis' misrepresentations that induced them to invest in the failed venture in the first place, and we have concluded that the evidence supports those claims. The Siddiquis make no other challenge to the trial court's denial of their request for a money judgment and attorney's fees against Qureshi and Ali.

Having rejected the Siddiquis' arguments, we overrule their seventh issue.

## CONCLUSION

We sustain the appellants' first issue and sustain in part their third and fifth issues. We overrule the appellants' second, fourth, sixth, and seventh issues. We reform the trial court's judgment to delete that portion of the judgment holding Ajaz R. Siddiqui, Najeeb Siddiqui, and Suncoast Construction, Inc., liable to Farhan S. Qureshi and Syed Khalid Ali based on breach of fiduciary duties. We further reform the award of actual damages to Farhan S. Qureshi and Syed Khalid

45

Ali to provide that Farhan S. Qureshi and Syed Khalid Ali jointly recover from Ajaz R. Siddiqui and Najeeb Siddiqui, jointly and severally, actual damages in the amount of $425,000.00, plus prejudgment interest on that sum at the annual rate of 5%, in the amount of $45,050.00, and court costs. We delete that portion of the judgment rendering Suncoast Construction, Inc., jointly and severally liable for the actual damages awarded. We affirm the judgment as modified.


/s/    Ken Wise
Justice


Panel consists of Justices Jamison, McCally, and Wise.